**In re The MONARCH TOOL & MFG. CO., Debtor-in-Possession.**

**The MONARCH TOOL & MFG. CO., Movant (Debtor),**

v.

**MONARCH PRODUCT SALES CORP., Respondent.**

**Bankruptcy No. 1-90-00595.**

United States Bankruptcy Court, S.D. Ohio, W.D.

April 10, 1990.

Paul Nemann, Cincinnati, Ohio, for Monarch Tool & Mfg. Co.

Irving Harris, Cincinnati, Ohio, for Monarch Product Sales Corp.

Charles Caldwell, Asst. U.S. Trustee, Cincinnati, Ohio.

DECISION

BURTON PERLMAN, Chief Judge.

This matter is before the court on the motion of Monarch Tool and Manufacturing Company (hereafter Debtor) to reject an executory contract, the parties to which were itself and Monarch Product Sales Corporation (hereafter Distributor). Debtor thus invoked 11 U.S.C. Section 365. The court has jurisdiction of this matter under 28 U.S.C. Section 1334 and the General Order of Reference entered in this district. This is a core proceeding under 28 U.S.C. Section 157(b)(2)(A). A hearing was held on the motion at the conclusion of which we reserved decision.

We find the following facts. Debtor is a manufacturer of coin inserting mechanisms used in coin-operated commercial vending machines. For many years prior to the filing of the petition which initiated this case, Debtor was one of the major national suppliers of such products. In 1987, Debtor entered into an exclusive distributorship agreement (hereafter "Agreement") with Distributor. The parties agree that the Agreement is executory, and it is that Agreement which is the subject of the present motion. In the Agreement, Debtor granted to Distributor the exclusive right to sell its products in the United States. Additionally, Distributor agreed to purchase all of the products from Debtor that Debtor had manufactured pursuant to Distributor's purchase orders. Distributor warranted the manufacture and workmanship of the coin chutes that it sold. Pursuant to the terms of the Agreement, the prices at which Debtor could sell its products to Distributor could only be changed by mutual agreement.

In earlier days, Debtor had had exclusive distributorship agreements with two other firms, Heath and Phillips. The Heath arrangement was profitable, had continued for a long time, but terminated upon the death of its principal after flourishing for a number of years. The Phillips agreement was unsatisfactory and ended after some five years when the parties could not get along. Under those arrangements, Debtor's operation had been profitable. Subsequent to that time, however, there was a history of declining profitability and appreciable losses up to and including the advent of the Agreement in 1987. This trend was being reversed when a dispute between the parties to that Agreement arose in mid-1989.

In an effort to improve the fortunes of Debtor, its management embarked on a program to improve the efficiency of its operation, and to improve profitability. A number of employees were laid off and an incompetent bookkeeper was let go. Debtor then sought to increase its profitability by looking to its exclusive distributorship arrangement. Debtor notified Distributor that it was increasing prices set out in the schedule governing the relationship between the parties. This occurred in the Fall of 1989. Prior price increases had been agreed to by the parties upon a showing that the increases were justified. The Fall, 1989 price increases, however, were not warranted by increased costs, and accordingly we infer that the price increase was submitted for the purpose of breaking the Agreement. Distributor believed the price increases to be non-competitive and would not agree to them.

The parties were unable to reach an agreement, and Distributor filed suit in the Kenton County Circuit Court in the State of Kentucky, seeking injunctive relief. The Kentucky court in Monarch Products Sales Corporation v. Monarch Tool and Manufacturing Company, Case No. 89–CI–02094, issued its "Findings of Fact, Conclusions of Law and Order Granting Temporary Injunction". In that Order, the Kentucky court entered an order temporarily enjoining Debtor from terminating the Agreement, stating in connection with this action that "to permit Tool [Debtor] to take over 'in house' distribution of its products and terminate the Distributorship Agreement with Product [Distributor] would not be equitable or just and would be contrary to law."

At the hearing here on the motion to reject the Agreement, Debtor argued that it does not have sufficient funds to meet payroll and that if the court does not allow it to reject the Agreement, the Debtor will be forced to liquidate. The Hall family, principals of the Debtor, stated in court that they would advance no further funds to Debtor absent such rejection. If the Agreement is rejected, they are prepared to advance substantial funds to the Debtor in order for it to continue operating.

The issues which are presented are (1) whether Debtor is collaterally estopped from rejecting the Agreement by virtue of the Kentucky court order, and (2) whether Debtor should be permitted to reject the Agreement.

### 1. *Collateral Estoppel.*

In the present matter, it is the position of Distributor that this court should give pre-

clusive effect to the decision of the Kentucky state court which made extensive findings of fact, including that earlier quoted herein, and conclusions of law, in granting Distributor a temporary restraining order. We find, however, that collateral estoppel is inapplicable in the present circumstances. The Court of Appeals for the Sixth Circuit has recently held in *United States v. Sandoz Pharmaceuticals Corp.*, 894 F.2d 825 (6th Cir.1990):

> The doctrine of collateral estoppel may be applied only if four criteria have been satisfied:
>
> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;
>
> (2) determination of the issue must have been necessary to the outcome of the prior proceeding;
>
> (3) the prior proceeding must have resulted in a final judgment on the merits; and
>
> (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding. [Citation omitted].

■ Distributor argues that Debtor is collaterally estopped from rejecting the Agreement because the "issue of whether the Agreement is a benefit or burden to the estate has already been decided in Monarch Product's favor by" the Kentucky court. That court issued a temporary injunction prohibiting the Debtor from terminating the Agreement and requiring it to continue to fill the Distributor's orders under the Agreement. In the instant matter, a final determination of the right of a Debtor to reject an executory contract pursuant to 11 U.S.C. Section 365 is sought. It cannot be said that what was before the Kentucky state court on a motion for a temporary injunction presents precisely the same issue. Furthermore, the Kentucky court expressly contemplated a further trial "on the merits" so that the result of its consideration was not a final judgment on the merits. For these reasons we are compelled to conclude that we cannot accord collateral estoppel effect to the Order of the Kentucky state court.

### 2. *Rejection of the Executory Contract.*

#### a. Whether the Agreement Is An Executory Contract

The Bankruptcy Code does not define the term "executory contract". The legislative history suggests that the court may find a contract to be executory where "performance remains due to some extent on both sides." H.Rep. No. 95–595, 95th Cong. 1st Sess. 347 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 58 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5844, 6303. See also *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Many courts have either adopted or cited with approval Professor Countryman's definition of executory contract under Section 70(b) of the Bankruptcy Act, the predecessor to current Section 365. Professor Countryman stated that an executory contract would be found in "[a] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, Executory Contracts in Bankruptcy: Part I; 57 Minn.L.Rev. 439, 460 (1973). See *In re Select–A–Seat Corp.*, 625 F.2d 290, 292 (9th Cir.1980) (definition adopted); *In re Terrell*, 892 F.2d 469, 471, n. 2 (6th Cir. 1989) (definition cited with approval). The Court of Appeals for the Sixth Circuit has stated that "[t]he key, it seems, to deciphering the meaning of the executory contract rejection provisions is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act." *In re Jolly*, 574 F.2d 349, 351 (6th Cir.1978).

■ Applying this test in the instant case, clearly the objectives of the Agreement have not yet been accomplished. Debtor granted to Distributor the ongoing

exclusive right to sell its products. Additionally, Distributor agreed to purchase all the products for which it had placed orders with Debtor and that Debtor had manufactured pursuant to such purchase orders. Distributor also warranted the manufacture and workmanship of the coin chutes that it sold. Under the *Jolly* test, therefore, the Agreement is executory.

Agreements similar to the instant one have been held to be executory. See *In re Cutters, Inc.*, 104 B.R. 886, 889 (Bankr.M. D.Tenn.1989); *In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561 (Bankr.W.D. Wash.1983); *Matter of Smith Jones, Inc.*, 26 B.R. 289 (Bankr.D.Minn.1982).

b. Rejection

■ Having concluded that the instant contract is executory, we must consider whether it is proper for Debtor to reject the contract. Rejection of an executory contract is governed by the provisions of Section 365(a). Section 365(a) provides in pertinent part:

> [T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

Section 365(a) does not set forth the criteria to determine when rejection of an executory contract is appropriate. Generally a Chapter 11 debtor has great latitude in rejecting executory contracts in its sound business judgment. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1195, 79 L.Ed.2d 482 (1984); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985), cert. denied 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *Borman's, Inc. v. Allied Supermarkets, Inc.*, 706 F.2d 187 (6th Cir.1983). However, a Chapter 11 debtor's right to reject executory contracts is not unlimited. *Infosystems Technology, Inc. v. Logical Software, Inc.*, 1987 WL 13805, 1987 U.S. Dist.Lexis 6285 (D.C. Mass.1987), remanding 66 B.R. 683 (Bankr. D.Mass.1986); *In re Chi–Feng Huang*, 23 B.R. 798 (Bankr.App. 9th Cir.1982); *In re Meehan*, 46 B.R. 96, 101 (Bankr.E.D.N.Y. 1985) aff'd 59 B.R. 380 (E.D.N.Y.1986); *In re Southern California Sound Systems, Inc.*, 69 B.R. 893 (Bankr.S.D.Cal.1987); *In re Petur U.S.A. Instrument Co., Inc., supra.*

Disproportionate damage to the other party to the contract provides a ground for disapproving rejection. *In re Meehan, supra; In re Petur U.S.A. Instrument Co., Inc., supra.* We find this factor to be present in the case before us. Distributor was set up for the express purpose of dealing exclusively with the products of Debtor. Quite simply, if rejection is permitted here, Distributor will be ruined.

It has been suggested that disapproval of rejection ought not to be allowed on the basis of this factor alone, for rejection of an executory contract inevitably entails the disappointment of legitimate business expectations. *In re Meehan, supra*, 46 B.R. at 101. In the case before us the factor of disproportionate harm to Distributor is reinforced by other consequential facts. It is our finding of fact based upon the trial record that the Debtor does not presently have management competent to lead it to a successful reorganization. Rejection of the contract, displacing Monarch Products, and installing a young relatively inexperienced sales person to shoulder the burden formerly borne by Monarch Products, would not improve the fortunes of this Debtor because there is insufficient executive ability within the Debtor to assure benefit to the Debtor from the employment of such an individual. Management now is in the hands of Stephanie Hall and Howard Liebelt. Liebelt is a resident of Florida who is in the Cincinnati area for only several months out of the year. Hall, who heads the enterprise, did not display the command of the operation, either as to its financial aspects, its production aspects, or its merchandising needs, as would lead one to believe that the declining fortunes of this Debtor will be reversed under her hand.

There is intimation in some decisions that benefit to general unsecured creditors should be considered by a court in reaching a decision on whether to approve rejection of an executory contract. *In re Chi–Feng Huang, supra*, at 801; *Infosystems Tech-*

*nology, Inc. v. Logical Software, Inc., supra.* We have considered this factor in the present case, and conclude that allowing rejection of the Agreement will not benefit general creditors. In the end all that could be beneficial to general creditors would be a successful rehabilitation of the Debtor, but the inadequacies of management which we find to exist make it clear that the fortunes of the Debtor will not be retrieved if rejection is permitted. In this connection, it is relevant to make reference to the evidence that the Hall family, principals of Debtor, stated in court that they would advance no further funds to Debtor unless the exclusive distributorship agreement with Monarch Products was rejected. If it is rejected, they are prepared to advance substantial funds to the Debtor in order for it to continue its operation. While this scenario is presented by the Hall family, there was no inclusion in this statement that the Hall family would agree to subordinate its further loans to the claims of unsecured creditors. From this, we think it fair to infer that a condition of any such further loan by the Hall family would be coupled with a request for priority status over existing creditors, and no benefit to general creditors in the foreseeable future can be anticipated.

Rejection of the subject exclusive distributorship agreement will be disapproved.